UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JANE DOE, individually and on behalf of her
minor child, SARAH DOE,[1]

        Index No. 25-CV-2304 (GRB)(ST)

              Plaintiffs,

        **FIRST AMENDED**
        **VERIFIED COMPLAINT**

   - v -

OCEANSIDE UNION FREE SCHOOL DISTRICT,
JILL DE ROSA, in her individual capacity,
BRENDON MITCHELL, in his individual capacity,
ANTWAN HASKOOR, M.D., in his individual capacity,
and MARY CONLAN, in her individual capacity.

              Defendants.
-------------------------------------------------------------------x

By and through her attorneys, Gibson Law Firm, PLLC, Sujata S. Gibson, of counsel,

Plaintiff Jane Doe, individually and on behalf of her minor child, Sarah Doe, alleges as follows:

## PRELIMINARY STATEMENT

1. This action seeks redress for Sarah Doe, a sixteen-year-old student with severe disabilities,

whose right to a public education has been denied by the Oceanside Union Free School District

and its officials through discriminatory refusal to accommodate her medical and religious needs.

After the 2019 repeal of New York's religious exemption for school vaccines (NYS Public Health

Law § 2164), Sarah was forced to receive eighteen vaccine doses, including two Hepatitis B doses,

back to back on a highly compressed timeline, causing catastrophic health consequences, including

---

[1] To protect the child's medical privacy, the names of the child and her mother are changed in this complaint to
pseudonyms. A motion to proceed by pseudonym will follow shortly after the filing of this complaint.

acquired von Willebrand's disease, autoimmune hypersensitivity, chronic infections, and periodic paralysis.

2.    Sarah is now fully up to date on all required vaccines other than a third booster of the Hepatitis B vaccine. Despite certifications from six New York State-licensed physicians that Sarah cannot safely receive the third Hepatitis B dose, Defendants arbitrarily denied most of her medical exemption and accommodation requests, excluded her from school since October 2024, and imposed a categorical policy requiring anaphylaxis for exemptions, violating her rights under federal and state disability laws.

3.    As a result of Defendants' actions, Sarah has been deprived of most of her sophomore year, with devastating academic, financial, emotional, physical and mental health consequences. On June 11, 2025, Plaintiffs submitted a new medical exemption request for the 2025/2026 school year, consistent with prior certifications and nationally recognized evidence-based standards of care, but Sarah remains excluded pending Defendants' response, perpetuating her harm. Defendants' refusal to accommodate Sarah's disabilities—despite overwhelming medical evidence—and their retaliatory harassment, including denying her use of a mobility scooter and publicly humiliating her, constitute deliberate indifference under the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and New York State Human Rights Law (NYSHRL).

4.    Defendants' enforcement of the vaccine mandate also violates Plaintiffs' First Amendment Free Exercise rights by denying religious accommodations while exercising discretionary authority over medical exemptions (10 NYCRR § 66-1.3), as evidenced by inconsistent denials, procedural barriers, and Nurse Mary Conlan's statements expressing bias against Sarah's prior religious exemptions as a basis to suspect her medical needs. This discretionary system,

condemned in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), triggers strict scrutiny, which Defendants fail. Defendants' actions further infringe Jane Doe's Fourteenth Amendment right to make medical decisions for her child and Sarah's New York State constitutional right to a sound basic education.

5.    Through this action, Plaintiffs seeks injunctive relief to reinstate Sarah with a medical exemption, declaratory relief that Defendants' enforcement is unconstitutional, compensatory and punitive damages for profound harm, and attorneys' fees under 42 U.S.C. § 1988 and related laws.

**Medical Exemption Under New York State Law**

6.    Under the Public Health Law, § 2164(8): "If any physician licensed to practice medicine in this state certifies that such immunization may be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health."

7.    Regulatory guidance from the New York State Department of Health (NYSDOH) states that "*May be detrimental to the child's health* means that a physician has determined that a child has a medical contraindication or precaution to a specific immunization consistent with ACIP guidance or other nationally recognized evidence-based standard of care." NYCRR 66-1.1(l).

8.    "ACIP" is the Centers for Disease Control and Prevention's ("CDC") "Advisory Committee on Immunization Practices," which issued Best Practices Guidelines based on evidence reviewed in 2010.

9.    The CDC is not licensed or authorized to practice medicine or give treatment recommendations to individuals.

10. The ACIP committee has repeatedly admitted that their guidelines are not an exhaustive list of all precautions and contraindications to vaccination, and cannot be used to define the medical exemption, which must be determined by a treating physician in accordance with evidence and clinical judgment.

11. ACIP defines "Contraindication" as "conditions in a recipient that increases the risk for a serious adverse reaction to vaccination" and states that in such situations, "vaccines should not be administered." ACIP Best Practices Guideline P. 51.

12. ACIP defines "Precaution" as "a condition that might increase the risk for a serious adverse reaction, might cause diagnostic confusion, or might compromise the ability of the vaccine to produce immunity." ACIP further notes, as an example, that "The presence of a moderate or severe acute illness with or without fever is a precaution to administration of all vaccines."

13. The ACIP notes that the specific contraindications and precautions listed in their guidelines (e.g., severe allergic reaction to a vaccine component or moderate/severe acute illness) are examples and not exhaustive, allowing for clinical judgment in complex cases where other conditions pose similar risks.

14. In 2019, a lawsuit was filed mounting a facial constitutional challenge to these regulations. The NYSDOH represented in sworn pleadings and submissions that the regulations did not limit accommodation to ACIP contraindications or precautions and would also include other evidence-based standards of care, including conditions listed on package inserts and other sources.

15. All of Sarah's exemption requests are consistent with ACIP and other evidence-based standards of care.

16. The plain language of both the Public Health Law and implementing regulations impose only a singular physician standard. That if "any physician" or "a physician" certifies that a child qualifies, that child "shall" be exempt. There is no provision that multiple physicians have to agree.

**The Constitutional Problem: Discretionary Medical Exemptions Without Religious Accommodation**

17. Defendants' conduct exposes a fundamental constitutional violation in New York's approach to vaccination requirements. By exercising discretionary authority to deny medical exemptions while providing no religious accommodation whatsoever, Defendants have created precisely the type of system that the Supreme Court condemned in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

18. In *Fulton*, the Supreme Court held that "a formal mechanism for granting individualized exceptions renders [a] policy not generally applicable, regardless of whether any exceptions have been given." 593 U.S. at 537. The Court further emphasized that "the creation of a formal mechanism for granting exceptions renders a policy not generally applicable, regardless of whether any exceptions have been given, because it 'invite[s] the government to ... grant ... exemptions ... based on the circumstances.'" *Id.*

19. Here, Defendants have demonstrated that they exercise significant discretionary authority over medical exemption requests. As explained in detail below, they have: - Denied exemptions from multiple licensed physicians without explanation - Selectively accepted some exemptions while rejecting others with identical medical justifications - Created procedural obstacles and catch-22s to avoid granting exemptions - Pressured and threatened physicians to withdraw their medical recommendations - Refused to follow their own stated procedures for exemption review

20. This pattern of discretionary decision-making regarding medical exemptions defeats general applicability.

21. Because the Public Health Law is not generally applicable as applied, this triggers strict constitutional scrutiny over the burden it places on the free exercise of Jane and Sarah's rights to make medical decisions in accordance with their guidance from God.

22. Defendant's discretionary medical exemption policy also violates Jane's right to make medical decisions for her daughter in accordance with the advice of treating physicians, who have each certified that Sarah is at significant risk of harm or death if she is to receive the last Hepatitis B shot at this time.

23. Alternatively, if Defendants contend that they lack discretion to deny medical exemptions submitted by a New York State licensed physician, then Sarah's exemptions—which have been certified by six licensed New York physicians—must be honored as a matter of law, and the District's denials rejected.

24. Either way, Defendants' conduct violates Sarah's constitutional rights and statutory entitlements.

## JURISDICTION AND VENUE

25. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1983 (federal claims), and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

26. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Nassau County, which is within this judicial district, and Defendants reside within this district.

## PARTIES

27. Jane Doe is a resident of Nassau County and is the mother and natural guardian of Sarah Doe.

28. Sarah Doe is a sixteen-year-old student who resides with her mother in Nassau County.

29. Defendant Oceanside Union Free School District is a public school district organized under the laws of the State of New York, with its principal place of business located at 145 Merle Avenue, Oceanside, NY 11572.

30. Defendant Dr. Brendon Mitchell is the Principal of Oceanside High School, located at 3160 Skillman Avenue Oceanside, New York 11572, and he was at all relevant times the ultimate decision-maker for accepting or rejecting a medical-exemption certificate at the High School. Dr. Mitchell is sued in his individual capacity for disability discrimination, including aiding and abetting, as well as harassment and retaliation.

31. Defendant Dr. Jill De Rosa is the Assistant Superintendent of Schools for the Oceanside Union Free School District, and in that role she personally conveyed denials, imposed an unlawful State-review precondition, and refused to act on new exemptions submitted by Plaintiffs. Dr. De Rosa is sued in her individual capacity for disability discrimination, including aiding and abetting, as well as harassment and retaliation.

32. Defendant Antwan Haskoor, MD FAAP, is a physician who served as a medical consultant to the Oceanside Union Free School District in connection with Sarah Doe's medical exemption requests. Dr. Haskoor is sued in his individual capacity for disability discrimination, including aiding and abetting, as well as harassment and retaliation.

33. Defendant Mary Conlan, is employed as a school nurse by the Oceanside Union Free School District and is sued in her individual capacity for disability discrimination, including aiding and abetting, and harassment and retaliation in connection with Sarah Doe's medical exemption requests.

## COMPLIANCE WITH STATUTORY PREREQUISITES

34. On October 31, 2024, Plaintiff timely filed a Notice of Claim upon the Oceanside Union Free School District in accordance with New York Education Law § 3813 setting forth ongoing violations of state law in connection with the denial of Sarah's medical exemption.

35. More than thirty days have elapsed since the filing of the first Notice of Claim, and Defendants have neglected or refused to adjust the claim within the statutory period.

36. This action is commenced within one year of the events giving rise to the claims herein, as required by the New York State Education law.

## FACTUAL ALLEGATIONS

### Sarah's Background and Family Circumstances

37. Jane Doe is a mother of three children, including Sarah Doe, her youngest.

38. Jane is a registered nurse.

39. Jane Doe is also a devout Catholic whose religious faith informs her approach to medical decision-making for her children. She believes that parents have a God-given responsibility to make medical decisions for their children in consultation with trusted physicians, and guidance from prayer.

40. Her two older children are settled in college, and she has been working hard to maintain stability for her youngest daughter, Sarah, to finish high school.

41. Jane and Sarah Doe moved to the Oceanside Union Free School District before the start of the 2024-2025 school year.

42. Sarah was excited about attending Oceanside High School, which is where generations of her family had graduated from. She already had friends in the school district and, being sociable, knew she would make more friends.

43. Sarah is also an outstanding athlete and was excited to join Oceanside's sports program.

44. Sarah settled into her new room (her mother's old room), made many friends, and was her usual happy self.

45. Sarah began school at Oceanside High School in the fall of 2024.

46. As detailed below, unfortunately Sarah's start at Oceanside High School was met with continuous harassment and denial of reasonable accommodation by Defendants, not just from the request for an exemption from the Hepatitis B vaccine, but multiple other disability related requests.

47. Defendants' arbitrary and unlawful failure to accommodate Sarah's well-documented disabilities cruelly dismantled the hopeful life she was excited to start forging at Oceanside High School. This deplorable conduct has inflicted profound trauma on a young woman already grappling with severe health challenges, shattering her aspirations, plunging her dangerously behind in her education, and causing irreparable emotional and physical harm through exacerbated stress and despair.

**Sarah's Medical Conditions and History**

48. As of June 2025, Sarah has received every required vaccine except for the third dose of the Hepatitis B vaccine.

49. Due to her disabilities, and previous severe adverse reaction, Sarah cannot safely take this third dose of the Hepatitis B vaccine. In fact, **six treating physicians and one nurse practitioner have certified that a third Hepatitis B dose poses serious risk to Sarah because of her documented bleeding disorder, autoimmune hypersensitivity, and prior severe reaction**.

50. Prior to 2019, Sarah was an exceptionally healthy child with no significant medical conditions.

51. Sarah had had a severe reaction as a child to a vaccine given in 2009, and her sibling who had similar severe reactions, ended up in the hospital in even worse condition.

52. Jane, a devout Catholic, prayed and felt she received clear guidance from prayer that she should not vaccinate her children anymore.

53. Sarah received a religious accommodation until 2019 after that point, which honored both the family's sincere religious convictions and Sarah's medical needs.

54. In order to attend school after New York repealed the religious exemption in 2019, Sarah was forced to choose between her education and her family's religious convictions and medical judgment. This coercion violated both her religious liberty and her right to make informed medical decisions with her family.

55. To return to school after the law changed, Sarah had to take an aggressive catch-up schedule of eighteen doses of the various remaining required vaccines over the course of about six weeks.

56. Included in this schedule was the requirement that she take two doses of the Hepatitis B vaccine essentially back-to-back.

57. Following administration of these vaccines, including the second Hepatitis B dose, Sarah's health dramatically deteriorated.

58. She developed intense pain throughout her body, severe kidney issues, debilitating migraines, severe immune system reactions, continuous severe rashes, seizures, repeated sepsis, and numerous other symptoms that have required hospitalization, caused her to come close to dying twice, and caused her to miss significant amounts of school.

59. Sarah's health has continued to deteriorate, and she has a constellation of impairments and conditions that her physicians are actively attempting to diagnose and understand.

60. **Sarah was recently diagnosed with acquired von Willebrand's disease**, among other serious conditions, and is currently experiencing a severe flare of what multiple doctors believe is an acute autoimmune hypersensitivity reaction with multiple triggers that have yet to be understood and diagnosed.

61. **Acquired von Willebrand disease is a contraindication**. This is a hematologic (blood) disease that causes abnormal bleeding, which can sometimes be severe. The package inserts for the available HBV vaccines both name thrombocytopenia (low platelets) as known and acknowledged adverse events. This is clinically relevant because a patient who already has a bleeding tendency, as Sarah does due to her von Willebrand's disease, may

be at risk for severe or life-threatening hemorrhage were she to develop thrombocytopenia as well.

62. One of Sarah's other current issues include but are not limited to a full-body rash that she describes as feeling "like her skin is being ripped off," ongoing fevers, periodic partial paralysis and pain.

63. **Autoimmune hypersensitivity reaction is a recognized adverse reaction to the Hepatitis B vaccine, listed on the package inserts of both available brands, and is another contraindication to further doses of this vaccine**.

64. Sarah has to take antihistamines twice a day just to function. Some of these medications are losing their efficacy, and certain antihistamines like Benadryl and Zyrtec have stopped working for her entirely.

65. Sarah's lab work also shows abnormal results requiring continued medical investigation. Recent tests confirmed that Sarah currently has multiple infections that have not resolved despite medication indicating an immune system issue, including but not limited to mycoplasma infection, Lyme disease, babesia infection, Epstein Barr and repeated strep.

66. Sarah also has suffered temporary paralysis on multiple occasions. For example, in the fall of 2024, Sarah's foot became paralyzed for a period of time after an injury and an illness. Last week, Sarah had to be carried to the emergency room because her leg became paralyzed. Now back from the hospital, Sarah is still undergoing diagnostic workup to determine the cause and still has pain and tingling in various extremities.

67. Sarah's constellation of impairments and need for continued diagnostic workup to determine the cause of her severe conditions fit with in the precautions and contraindications for vaccination under the CDC's ACIP guidelines.

68. **Six treating physicians and one nurse practitioner** have certified that Sarah's constellation of disabling conditions constitute precautions and/or contraindications to vaccination for Hepatitis B right now, and also that she is at heightened risk for a severe adverse reaction and/or death if she were to get vaccinated against medical advice.

69. Sarah is disabled within the meaning of the ADA as her constellation of impairments substantially limits one or more major life activities. Her constellation of conditions, which have persisted and worsened since 2019, impair the functioning of multiple bodily systems, including her hemic, immune, neurological, and musculoskeletal systems. Her symptoms, such as intense pain, chronic fevers, and periods of paralysis, significantly restrict her ability to perform daily activities, attend school consistently, and engage in normal physical and social functions. Sarah's ongoing medical needs, frequent hospitalizations, and the necessity for continued diagnostic workup to address her complex and severe health issues further confirm her status as a disabled individual under the ADA.

**Additional Medical Expert Opinions Supporting Exemption**

70. Notably, Dr. Clayton Baker, a seventh New York State licensed physician who has reviewed Sarah's medical history and exemption requests and confirmed vaccination is contraindicated, provided an expert affidavit stating that, as explained in detail below, **Dr. Haskoor's refusal to accommodate Sarah is so unreasonable given the overwhelming**

**evidence of potential harm to her caused by receiving a third dose of the Hepatitis B vaccination that it constitutes medical negligence**.

71. Dr. Baker's professional opinion, and the overwhelming consensus of many medical professionals, confirms that Sarah's exemption requests comply with evidence-based national standards of care and that vaccination would pose serious risks to her health given her documented conditions.

72. Defendants' refusal to accommodate Sarah is particularly unreasonable given that: 1. Hepatitis B is not communicably transmitted in school settings, 2. The CDC acknowledges there has never been a documented case of Hepatitis B transmission in any school setting, and 3. This particular vaccine is for personal protection rather than preventing transmission, rendering the district's denial of seven treating medical professional's clinical assessments particularly egregious.

73. In fact, if Sarah Doe had an active Hepatitis B infection, state and federal law and District policy mandate that she cannot be excluded from school on that basis because students with active Hepatitis B are not a direct threat in a school setting and cannot be excluded on that basis.

**Fall 2024 – Disability Harassment Starts When Jane Mentions Medical Accommodation and Nurse Discovers History of Religious Accommodation**

74. Under New York State Law, children under eighteen must receive between 60-72 vaccine doses to attend school.

75. **Sarah is missing only the third Hepatitis B vaccine dose, and she has been permitted to attend school since 2019 without it due to submission of titers**.

76. In or around September 19, 2024, Nurse Conlan stated that Sarah's titers were not at a high enough level to show immunity, and she set a September 29, 2024 vaccination deadline. Jane mentioned she would be seeking a medical exemption.

77. The Nurse also noticed, at that time, that Sarah had a religious accommodation until 2019. From that point a campaign of hostility, harassment and retaliation by Nurse Conlan and the school started against Sarah Doe and her mother, both on the basis of hostility to her prior religious accommodation, and the announcement that she would be seeking medical accommodation.

78. A few days later, Sarah came to drop off paperwork in the nurse's office. Nurse Conlan humiliated her by saying, **in front of other students and staff**, "I'm fighting with your mom, you shouldn't even be here! **You need to just get the vaccine!**" Sarah was very embarrassed to have her private vaccine information discussed in front of other students.

79. Nurse Conlan's conduct was deliberately designed to shame and pressure Sarah based on her disability status and religious and medical needs, constituting aiding and abetting disability and religious discrimination. Upon information and belief, Nurse Conlan's public disclosure of Sarah's vaccination status violated District confidentiality rules and DOE FERPA guidance.

80. Nurse Conlan harassed and retaliated against Sarah in other ways as well. For example, Sarah's foot was paralyzed in the fall of2024. Sarah was unable to walk on crutches as it exacerbated the pain related to her rashes and , and so Jane bought Sarah a scooter to use both at and outside school for personal mobility. Nurse Conlan, however, refused to allow Sarah to use the scooter at school, even though she was unable to walk or use crutches.

81. Jane and Sarah Doe begged Nurse Conlan and the school district to be reasonable, but they would not, **even obstructing reasonable requests for a wheelchair**. This retaliation forced Sarah to miss over a week of school.

82. Nurse Conlan's pattern of hostility and retaliation persisted throughout the semester. In one instance, as Sarah began recovering from paralysis, she experienced sudden severe nerve pain as sensation returned to previously numb nerves. During a free period, she sought temporary refuge in the nurse's office to remove her medical boot (which was exacerbating her nerve pain) and apply ice to her foot. Despite Sarah having no scheduled class at that time, Nurse Conlan displayed marked hostility, summarily rejecting her medical needs and demanding she leave immediately. **Nurse Conlan even went so far as to state the office was exclusively for "new" injuries**, demonstrating a callous disregard for Sarah's disabilities and ongoing medical condition and recovery process that has been confirmed by seven medical professionals.

83. Nurse Conlan's pattern of hostile conduct toward Sarah's medical needs and disabilities constitutes deliberate aiding and abetting of the District's discriminatory conduct and additional instances of the District's failure to accommodate.

84. Nurse Conlan continued this pattern of harassment and denial by including suspicious and unfounded negative comments with each of Sarah's medical exemption requests intimating that Sarah's failure to get vaccinated until the religious exemption was repealed in 2019 called into question the validity of her medical needs.

**Disability Discrimination Continues through Unreasonable Denial of Medical Exemptions**

85. On September 25, 2024, Jane submitted a DOH-approved form for a medical exemption request from Sarah's treating specialist, Dr. Jonathan Field, a New York State licensed physician and board-certified specialist in immunology.

86. Dr. Field certified that Sarah could not be safely vaccinated due to her medical conditions and required an exemption from the Hepatitis B vaccine requirement.

87. Dr. Field confirmed that vaccination would confuse diagnostic accuracy and interfere with planned treatment trials, and that it would not be safe for Sarah to be vaccinated during a flaring immune reaction. He also listed contraindications and precautions including "autoimmune flash on the entire body, ANA elevated" abnormal lab results and noted that Sarah was taking daily antihistamines.

88. Dr. Field's reasons identify precautions and contraindications consistent with ACIP and other nationally recognized evidence-based standards of care.

89. The same day, Nurse Conlan emailed the district's BOCES coordinator with the medical exemption request from Dr. Field, stating: "This is a student who was not immunized for anything until 2019 when the religious exemption ended. The student only had two pediatric doses of Hep B back in 2019…Regardless, she is here now and her mother is stating that she has a total body rash and is being worked up for a possible autoimmune disease and did not provide any more information. I am not sure if this qualifies as a legitimate reason for medical exemption. Can Dr. Haskoor look into this?

90. The same day Dr. Haskoor emailed back that he denied the request without providing any reason.

91. After Nurse Conlan noted that the family would probably ask for a reason, Dr. Haskoor wrote: "Reason provide [sic] does not meet criteria. If the parent and doctor disagree, I will need a consent to speak with the doctor."

92. Nurse Conlan sent Jane an email stating she was denied on September 27, 2024, stating there was no formal denial letter and she could not forward the email from the Dr. Haskoor and would not explain the denial other than to say it did not meet criteria.

93. On or about October 8, 2024, Principal Mitchell sent Sarah a letter stating the medical exemption was denied and Sarah had to be vaccinated by October 10, 2024.

94. Sarah then got mononucleosis and an extremely elevated white blood cell count, which allowed her to push this vaccination deadline back a few weeks.

95. Jane then took Sarah to get a second opinion at a family medicine practice. They were seen by a nurse practitioner, who confirmed that she did not think it was safe to vaccinate Sarah given her condition. The nurse practitioner called in one of the doctors at the practice to confirm, and he agreed it would not be safe to vaccinate Sarah given her condition and that she should be given a medical exemption.

96. On October 24, 2024, Jane Doe submitted a second medical exemption request from the nurse practitioner, who wrote that Sarah should be exempt due to her immune reactive rash, immunodeficiency, von Willebrand's disease, and concerning abnormal blood work. Jane also sent in releases for Dr. Haskoor to speak with either Dr. Field or the nurse practitioner.

97. The reasons in the second medical exemption are also consistent with ACIP and other nationally recognized evidence-based standards of care and further bolstered Dr. Field's

reasons, and together, the two certifications were more than sufficient under New York State law to entitle Sarah to an exemption.

98. The District, however, refused to honor this accommodation or even speak with Dr. Field or the nurse practitioner. Instead, Principal Mitchell notified Jane on or around October 25, 2024 that the school would exclude her on October 28, 2024 for failure to comply with vaccination requirements.

99. Sarah was excluded from school on or about October 28, 2024.

100. This was very triggering to Sarah and caused enormous stress. It felt like 2019 all over again, when Sarah was excluded from school and had to risk her health by submitting to eighteen back-to-back doses of vaccination to return, in violation of her faith and with devastating consequences. She felt she had already sacrificed her health and more to be able to attend school. She could not believe that after all she had given up she was now going to lose access to school and friends and her cherished sports teams over one last shot, which doctors and specialists universally agreed would imperil her health if not her life.

101. Sarah's exclusion also violated Jane's religious convictions. Having been forced to violate these convictions once in 2019 with devastating health consequences to her daughter, the prospect of being coerced again caused severe spiritual and emotional distress.

102. Sarah was desperate for normalcy after all of her health challenges. She wanted to participate in planned Halloween activities with her friends at Oceanside. She wanted to go out for the sports team. She wanted the nightmare and threat of exclusion to be over. She wanted all of her sacrifices to at least result in being able to attend school.

103. In distress over her exclusion from school, **Sarah attempted to get vaccinated at a drug store against medical advice, but they refused to vaccinate her**.

104. **Sarah then went with her father to City MD for vaccination, and intentionally did not tell the doctors at this walk-in clinic about all of her health challenge. But the doctors at City MD also refused to vaccinate her, citing her immune reactive rash and fever, and stating it was not safe to vaccinate her in that condition and she was INELIGIBLE**.

105. On October 29, 2024, Jane Doe submitted a letter from Robin Mackoff, DO, a New York State licensed physician at City MD, confirming that Sarah was not eligible for the Hepatitis B vaccine due to her active medical conditions and ongoing diagnostic workup.

106. These reasons also comport with ACIP and other nationally recognized evidence-based standards of care.

107. Despite having received certifications consistent with ACIP and other evidence-based standards of care from multiple licensed physicians that Sarah could not safely receive the Hepatitis B vaccine, the District refused to accommodate Sarah and would not provide any explanation as to why, further demonstrating the discretionary nature of their exemption review process.

108. On October 30, 2024, after further inquiry from Jane about why her daughter was being denied accommodation, Assistant Superintendent De Rosa informed Jane that she could not receive any exemption unless the school's medical director, who she later learned was at all relevant times Dr. Haskoor, spoke to the provider. Jane responded promptly with the contact information for City MD.

109. Jane also asked why the school's medical director—Dr. Haskoor—had not as of that date bothered to speak to Dr. Field yet. Assistant Superintendent De Rosa would not provide an answer other than to say that Dr. Field's exemption request had already been denied and that Jane's second request was under review, but Sarah would be excluded while it was reviewed.

110. On October 31, 2024, Principal Mitchell emailed Jane to let her know that the nurse practitioner's exemption supplement was denied because the school called and did not reach her (and did not leave a message). He stated that the City MD letter was under review but would not reinstate Jane pending such review.

111. Jane found an attorney who would represent her for the limited purpose of filing a notice and served a notice of claims on the school district on or about October 31, 2024, but received no response.

112. Jane repeatedly asked the District who the medical director was and they would not tell her. The District doctor also would not examine Sarah despite Plaintiff's offer of the same.

113. Jane then sought an opinion from Dr. Michael Richheimer, MD, who is the school district doctor of a neighboring district (Long Beach).

114. When Jane and Sarah first walked into Dr. Richheimer's office, he stated, upfront, that he would not write a medical exemption. Jane asked if he could just examine Sarah, and if he determined Sarah was healthy enough she would get the vaccine.

115. But after examining Sarah, Dr. Richheimer immediately agreed that Sarah could not be safely vaccinated and needed accommodation. He wrote a temporary accommodation letter

stating that she needed an exemption due to "dermatographia/hives despite multiple medications."

116. **Oceanside finally reluctantly granted Sarah a 60-day exemption (until February 4, 2025) based on the Long Beach district doctor's certification, which did not differ in any legal sense from those submitted by the others that had been denied. This selective acceptance demonstrates the arbitrary and discretionary nature of the District's exemption process**.

117. On or about November 14, 2024, Sarah was readmitted to school after being excluded for two weeks during the critical finals period for the first quarter. The exclusion caused Sarah's grades to suffer enormously, especially since she was not allowed to make up the exams or work.

## District's Continued Denials, Retaliation and Procedural Obstacles

118. Before Dr. Richheimer's 60-day exemption expired, Jane Doe again consulted with Dr. Richheimer, who said that he believed Sarah still could not safely be vaccinated due to her ongoing severe rashes, as well as newly developed health issues.

119. Despite confirming these medical concerns still existed, and his stated opinion that Sarah should not take the vaccine at that time, Dr. Richheimer declined to write another exemption, stating he feared "getting in trouble" if he provided another exemption. He told Jane she should get a medical exemption from someone else but that she did need one for Sarah.

120. Upon information and belief, Dr. Haskoor had threatened or otherwise pressured Dr. Richheimer not to provide further exemptions, demonstrating a pattern of interference with the physician-patient relationship and medical decision-making.

121. Jane Doe obtained another exemption from Dr. Fields without issue, which stated the exact same reasons that Dr. Richheimer had provided and extended the date out until May 4, 2025.

122. During the appointment in which Dr. Field wrote the exemption, he explained to Jane that Sarah was at significant risk of severe harm if she were to get vaccinated in her present state and that it would confuse diagnostic accuracy if she got vaccinated while they were doing work ups to figure out what was triggering her hyperimmune reaction.

123. Dr. Haskoor then contacted Dr. Fields and intimidated him so much that Dr. Fields subsequently claimed that he did not realize he was writing an exemption but thought he was writing a return-to-school note—an implausible position given the specificity and clarity of the exemption form he filled out. This request was on a form entitled "Medical Exemption Statement" which is only filled out for medical exemptions from vaccines. Under the section asking which vaccine the medical exemption is referring to, he checked "Hepatitis B." Under the section that states: "please describe the patient's contraindication(s)/precaution(s) here" he handwrote: "Dermatographia/Hives despite multiple medications" (which was exactly what his partner Dr. Richheimer had written, resulting in accommodation until February 4, 2025). Then, under "date exemption ends" Dr. Field wrote "5/4/2025" (exactly three months after the date the exemption was to begin, again consistent with Dr. Richheimer's successful exemption).

124. When Jane saw Dr. Field following the District's claim that he had not meant to write the form, he seemed scared and worried about retaliation for having written the exemption.

125. Upon information and belief, Dr. Haskoor also threatened or otherwise pressured Dr. Fields to recant his medical advice, constituting deliberate interference with Sarah's medical care and aiding and abetting disability discrimination.

126. The fact that the District accepted Dr. Richheimer's exemption request but denied an identical one from Dr. Field further emphasizes the discretionary and arbitrary nature of their decision-making process.

127. Jane Doe then got bloodwork for Sarah, which showed that her daughter has a mycoplasma infection, Lyme disease, and babesia infection as well as all of her other moderate to severe acute illnesses, each of which is a precaution under the ACIP guidelines.

128. Jane submitted this blood work and asked if Oceanside wanted an updated physician's certification seeking accommodation on the basis of these newly discovered additional conditions.

129. **Assistant Superintendent De Rosa replied that she should not bother, and that Oceanside would not consider any medical accommodation for Sarah, regardless of what she submitted**. Upon information and belief, this position was discussed and agreed to among the individual defendants, including but not limited to Nurse Conlan, Principal Mitchell, and Dr. Haskoor.

130. On February 4, 2025, the Oceanside School District suspended Sarah from school, stating that she could not come back until she received her Hepatitis B vaccine.

131. On or about February 9, 2025, Jane submitted to the District yet another medical certification from New York State licensed physician and Board Certified specialist Paul

B. Lang, M.D., who explained that (among other issues) Sarah should not be vaccinated because she had Lyme (more than four months) and a possible mycoplasma infection and three acute infections, and it was a contraindicated to immunize people like Sarah with active severe acute or moderate acute illness.

132. Dr. Lang correctly noted that moderate to severe illness was a precaution under the ACIP guidelines to vaccination.

133. On February 19, 2025, Jane went to Dr. Vincent Garbitelli, yet another New York State licensed physician, to evaluate whether Sarah could safely be vaccinated. He too agreed she could not be in her state and wrote a medical exemption. Dr. Garbitelli, who has been certified and served as an expert witness on the standard of care in over 60 court cases, wrote in the space asking to list the contraindications and precautions: "Autoimmune hypersensitive syndrome with blood clotting disorder and previous severe reactions to the Hepatitis B vaccine and mycoplasma infection all within a reasonable degree of certainty."

134. These reasons identify precautions and contraindications consistent with nationally recognized evidence-based standards of care as well as ACIP.

135. Jane emailed Assistant Superintendent De Rosa begging her to review the new requests and explaining that Sarah was "devastated about leaving Oceanside."

136. Assistant Superintendent De Rosa responded that the District would not review any more medical accommodation requests for Sarah Doe and that she had to seek an accommodation directly from the New York State Education Department.

137. However, Jane was informed by the New York State Education Department, Division of Vaccine that "[t]he New York State Education Department does not review requests for medical exemptions. If the school administration chooses to review the updated medical

exemption requests, you will need to send the exemption to school, upon their request. The school may choose to ask the New York State Department of Health Division of Vaccine Excellence to review the medical exemption, but they are not required to. The school administrator or school medical director would make that request."

138. The District thus created a procedural catch-22, claiming Jane Doe must submit exemptions to the state while the state simultaneously confirmed it was the District that must first review and deny the exemption before state review is possible.

139. This circular process prevented Sarah from having her valid medical exemptions properly considered and prolonged her exclusion from school, causing further educational deprivation and emotional distress.

**Sarah temporarily attends Long Beach school**

140. While attempting to resolve the issue with the medical accommodation at Oceanside, Sarah temporarily attended school in the Long Beach district for forty days.

141. The family owns property in that district that is being sold in the near future, but they were able to temporarily relocate back to Long Beach while they attempted to get Oceanside to accommodate their daughter. This relocation created substantial stress and financial hardship for the family.

142. It was also very hard on Sarah to try to catch up academically after being removed from Oceanside in the middle of a quarter.

143. Unfortunately, Dr. Haskoor's discriminatory conduct extended to influence Sarah's experience at Long Beach School District.

144. Dr. Richheimer, the Long Beach school district physician, once more seemed scared. **Without a reason, he said he was officially "denying" Sarah's medical accommodation requests from other doctors,yet simultaneously he himself granted her another sixty-day accommodation, sua sponte, for one of the identical medical reasons she had presented from other licensed physicians (dermatographia)**. Although Dr. Richheimer officially denied Sarah's medical exemption, Long Beach school continued to allow her to attend classes and school activities and events without her third dose of the Hepatitis B vaccine.

145. Upon information and belief, Dr. Richheimer implemented this contradictory accommodation process due to pressure from Dr. Haskoor, using this approach as a temporary workaround to maintain the appearance of denying the request while tacitly acknowledging vaccination posed a medical risk to Sarah and allowing her to be exempt.

146. Despite Sarah's efforts to adapt to her new educational environment at Long Beach, including joining the football team and working diligently to catch up academically, she remained significantly traumatized by her forcible removal from Oceanside.

147. Moreover, the temporary and precarious nature of her accommodation made it impossible for her to settle in. The final straw was when her varsity football coach told her that he had chosen her as quarterback, and that she was a "game changing athlete" who would likely have gotten a "full ride" to school on a sports scholarship, but he had to change gears because he learned Long Beach administrators intended to "fight" her mother's accommodation requests and would be removing Sarah from the school in the near future.

148. Upon information and belief, this determination stems directly from pressure exerted by Dr. Haskoor and the Oceanside School District, who have influenced Dr. Richheimer and have a vested interest in validating their own accommodation denials by compelling Long Beach to likewise reject Sarah's medical accommodations.

149. As a direct consequence of this revelation, Sarah experienced such profound psychological distress that she has refused to return to Long Beach.

150. The sixty-day accommodation Dr. Richheimer initially granted expired in April 2025, and Sarah returned to Oceanside.

## Continued Attempts at Accommodation from Oceanside

151. On April 4, 2025, Jane Doe formally renewed her request that Dr. DeRosa ensure the District review Sarah's additional medical accommodation documentation, emphasizing Sarah's urgent need to return to school and specifically inquiring about "2 newer medical Exemptions that have not been given to Dr. Donatelli" (Jane was given the impression by the Oceanside School District that Dr. Donatelli was the district's doctor, which went uncorrected in multiple communications). Jane Doe expressly requested: "Can you please submit them to him and maybe if he accepts them she can finish the last semester in Oceanside?"

152. **That same day, Assistant Superintendent De Rosa responded with another deflection, stating: "As we discussed previously, any new documentation needs to be submitted to the state. If exemption is approved at that level, we are eager to welcome Sarah back."**

153. On April 7, 2025, after confirming with the state that this was not possible, Jane Doe informed Assistant Superintendent De Rosa that this instruction contradicted the actual state procedures: "They told me you have to first review and deny the Medical exemptions, then I can file the appropriate paperwork with them. They will not accept an exemption review from the parent. The school has to request the review. The 2 medical exemptions I submitted are new."

154. On April 8, 2025, Dr. Haskoor wrote an email denying "all four" pending medical exemptions. He stated "None of the four physicians provided a clear contraindication to receiving Hepatitis B vaccine. If the student had a severe allergic reaction (e.g., anaphylaxis) I will need to speak with the physician that treat it and provide a medical record of the event."

155. Dr. Haskoor's official policy, which was adopted by the District and High School through its official policymakers, including but not limited to Principal Mitchell, was to deny valid medical exemption requests, even those in which a physician has determined that a child has a medical contraindication or precaution to a specific immunization consistent with ACIP guidance or other nationally recognized evidence-based standard of care, unless those reasons were consistent with a "clear contraindication" that Dr. Haskoor agreed with, For the Hepatitis B vaccine the only reason he would accept was "anaphylaxis" immediately after a past dose (and only after Dr. Haskoor spoke with the physician who treated it and corroborated another licensed physician's findings).

156. Dr. Haskoor's narrow policy allowing only documented immediate anaphylactic reactions for medical exemptions exceeds his medical consultation role and constitutes unauthorized

administrative policy-making that directly contradicts PHL § 2164(8)'s "any physician" standard.

157. Dr. Haskoof's addition of an extra-statutory pre-condition that he must personally interview the physician who treated the adverse reaction (no matter how long ago it occurred)bare requirements found nowhere in PHL § 2164(8) or 10 NYCRR § 66-1.3(c), which authorizes only the principal or "person in charge or a school" to request additional information. It **does not** empower the school physician to demand private medical records or physician interviews.

158. By insisting on direct disclosure of Sarah's historical medical records and physician communications, Dr. Haskoor sought unnecessary intrusion into Sarah's and her physician's rights to medical privacy and contrary to FERPA's confidentiality rules.

159. Dr. Haskoor's conduct constitutes deliberate indifference to clearly established statutory and constitutional rights by implementing an informal policy adopted by the District that is contrary to New York State law, rather than providing medical consultation within his authorized scope. Haskoor's unilateral standard converts a medical consultant into the sole gatekeeper, overriding the singular standard that a child is exempt if any physician certified risk of harm and adopting a requirement that all physicians agree. The District endorsed and enforced this policy, evidencing a policy or custom attributable to the District.

160. On April 14, 2025, not having heard anything on her pending medical exemption requests, Jane filed a lawsuit and an emergency TRO application seeking reinstatement before the start of the new quarter on April 21, 2025.

161. It was extremely difficult for the family to find a lawyer who was able to take the case without payment, especially given all of the urgent medical and logistical issues they were handling already, which contributed to the delay.

162. Yet Sarah still had a chance to finish out her year, but only if she acted quickly. Oceanside Union Free School District operates on a quarter system rather than a semester system. The reason that Sarah Doe wanted to try to return by April 21, 2025 was that it was the first day of the new grading quarter, and it would have allowed her to have completed the 10th Grade at her school with minimal grade disruption since the grading quarter was beginning anew that day.

163. An emergency hearing was scheduled for April 21, 2025. Jane's attorneys had two board members personally served with the motion and lawsuit on April 18, 2025. Still, the District failed to inform its attorneys and failed to appear at the hearing.

164. The state court judge and Plaintiff's attorney spent hours trying to determine who represented the school district. Plaintiff's attorney finally found a phone number of an attorney who often represented the District, and the Court and attorney reached him.

165. When the District's attorney appeared hours later, he said he was not familiar with the case and asked for an adjournment of the substantive hearing.

166. The state court judge agreed and rescheduled the hearing for the following Monday.

167. One business day before the hearing, the District notified Jane that her residency requirements were confirmed as met, but Sarah's medical accommodation request was denied and Sarah must submit proof of vaccination if she wanted to return to school.

168. The same day, Defendants removed the case to federal court, thus delaying any chance of a timely decision that would allow Sarah to return to school within a reasonable time after the start of the new quarter on April 21, 2025.

169. Sarah was excluded from the Oceanside Union Free School District

170. On or about June 6, Sarah Doe suffered partial paralysis of her leg and was rushed to the emergency room, where she spent the night. She is currently in the process of getting neurological and other workup to try to understand her severe cascade of symptoms.

171. On June 11, 2025, Jane's attorney submitted another exemption request to the school district from a New York State licensed physician whose certification identifies contraindications and precautions consistent with ACIP and other nationally recognized evidence-based standards of care.

172. Defendants continue to exclude Sarah Doe from school, and as of the filing of this Amended Complaint Plaintiff has not received a response to her recently submitted medical exemption.

**Impact on Sarah's Education and Well-Being**

173. Sarah's mental and emotional health is also at stake. She is now in a state of crisis.

174. Sarah is normally a happy, outgoing child, who tries to make the best of things. However, this last setback has broken her, and she is now staying in bed all day and is despondent.

175. She has developed depression, anxiety and adjustment disorder over the disability discrimination she has faced from Oceanside.

176. Jane is extremely worried about her child's mental health and well-being. Things were so bad that Jane sought psychiatric help.

177. On April 8, 2025, after her first visit, Sarah was formally diagnosed with adjustment disorder with mixed anxiety and depressed mood by a licensed psychiatrist, who, upon information and belief, attributed these conditions to Sarah's exclusion from school, denial of her accommodations, and separation from her peers and athletic activities.

178. Indeed, Sarah is exhibiting severe depressive symptoms, including social withdrawal, loss of interest in previously enjoyed activities, disrupted sleep patterns, and expressions of hopelessness, all stemming directly from her ongoing exclusion from school and the perceived discrimination against her disabilities.

## FIRST CAUSE OF ACTION

### Violation of the New York State Human Rights Law Against All Defendants

179. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

180. The New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296(4), prohibits educational institutions from denying the use of their facilities to any person otherwise qualified by reason of disability.

181. Sarah has disabilities within the meaning of the NYSHRL, and Defendants are aware of her disabilities, as demonstrated by the multiple medical exemption requests submitted by licensed physicians documenting her conditions.

182. Sarah is otherwise qualified to participate in the educational programs, services, and activities offered by Defendants, as she resides in the school district and meets all other educational requirements.

183. Defendants discriminated against Sarah by denying her reasonable accommodations in the form of a medical exemption from the Hepatitis B vaccine requirement, despite substantial evidence from multiple medical professionals that such vaccination would pose serious risks to her health given her documented conditions.

184. The NYSHRL imposes an affirmative obligation on educational institutions to make reasonable accommodations to enable persons with disabilities to enjoy the right to education.

185. Defendants also violated their accommodation duties under NYSHRL by imposing a "very strict interpretation" of vaccine exemption requirements that ignores Sarah's documented disabilities and impermissibly approaches accommodation requests based on generalized assumptions about whole categories of disabilities, rather than meeting the individualized assessment requirements of the federal and state statutes.

186. The requested accommodation would not fundamentally alter the nature of Defendants' educational program or impose an undue burden on Defendants, particularly given that: (a) Hepatitis B is not communicably transmitted in school settings; (b) The CDC acknowledges there has never been a documented case of Hepatitis B transmission in any school setting; and (c) The Hepatitis B vaccine is for personal protection rather than preventing transmission.

187. Defendants discriminated against Sarah by failing to conduct an individualized assessment of her accommodation needs, instead applying a blanket policy that makes unsupported, generalized assumptions about disabilities. Specifically, by asserting that only children with a documented anaphylactic reaction to a prior Hepatitis B vaccine

qualify for exemption, Defendants arbitrarily disregarded Sarah's unique medical conditions, as substantiated by six physicians' certifications and additional corroborating evidence and opinion. This categorical approach recklessly ignores the diverse needs of disabled children, violating their right to individualized consideration under disability law.

188. Defendants refused to grant other reasonable accommodations, such as the scooter accommodation requested or the accommodation of icing a foot in the nurse's office.

189. Defendants, in their individual capacities, aided and abetted the District's disability discrimination through deliberate indifference to Sarah's rights by:

- Deliberately interfering with Sarah's medical care and physician relationships, even at Long Beach;

- Pressuring and threatening physicians to withdraw medical recommendations, including intimidating Dr. Fields so severely that he appeared "scared and worried about retaliation"

- Humiliating and retaliating against Sarah based on her disability status, including public statements shaming Sarah in front of other students

- Refusing to engage in good faith review of medical exemption requests despite clear contraindications and precautions under nationally recognized standards

- Creating a hostile environment based on her medical needs and disabilities, including denying reasonable accommodations like mobility scooters

- Acting with deliberate indifference to Sarah's clearly established rights, when a reasonable official would have known their conduct violated established disability law.

190. As a direct and proximate result of Defendants' discriminatory actions, Sarah has suffered and continues to suffer harm, including, but not limited to: (a) Exclusion from educational

activities; (b) Severe emotional distress culminating in a formal diagnosis of adjustment disorder with mixed anxiety and depressed mood; (c) Social withdrawal, loss of interest in previously enjoyed activities, disrupted sleep patterns, and expressions of hopelessness; and (d) Deprivation of her right to be free from discrimination.

191. As a direct and proximate result of Defendants' discriminatory actions, Sarah and her family have also had to incur medical and other expenses that they would not have had to incur but for the Defendants' unreasonable denials of accommodation.

## SECOND CAUSE OF ACTION

### Violation of Title II of the Americans with Disabilities Act
### Against Organizational Defendant

192. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

193. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq., prohibits discrimination against qualified individuals with disabilities by any public entity.

194. Sarah is a qualified individual with disabilities within the meaning of the ADA, as her conditions, including von Willebrand's disease, allergic/autoimmune reactive disorders, Lyme disease, mycoplasma infection, temporary paralysis and related ongoing symptoms substantially limit major life activities including functions of her immune system, endocrine system, and hematological system among others.

195. Defendant Oceanside Union Free School District is a public entity within the meaning of Title II of the ADA.

196. Sarah is otherwise qualified to participate in the educational programs, services, and activities offered by Defendants. Oceanside admits she qualifies for residency requirements.

197. Defendant Oceanside Union Free School District discriminated against Sarah by denying her reasonable accommodations in the form of a medical exemption from the Hepatitis B vaccine requirement, despite substantial evidence that such vaccination would be dangerous to her health.

198. The requested accommodation would not fundamentally alter the nature of Defendant's educational program or impose an undue burden on Defendants.

199. Defendant Oceanside Union Free School District also discriminated against Sarah by failing to conduct an individualized assessment of her accommodation needs, instead applying a blanket policy that makes unsupported, generalized assumptions about disabilities. Specifically, by asserting that only children with a documented anaphylactic reaction to a prior Hepatitis B vaccine qualify for exemption, Defendants arbitrarily disregarded Sarah's unique medical conditions, as substantiated by six physicians' certifications and additional corroborating evidence and opinion. This categorical approach recklessly ignores the diverse needs of disabled children, violating their right to individualized consideration under disability law.

200. Defendant Oceanside Union Free School District also discriminated against Sarah by refusing to provide individual analysis about her accommodation needs but instead applying a categorical approach that makes assumptions about whole categories of disabilities in a generalized and reckless manner. Specifically, by adopting the unsupported position that the only disability that requires accommodation from Hepatitis

B is an allergy, and more specifically, an anaphylactic allergic reaction that occurred immediately after administration of a Hepatitis B vaccine, Defendants make categorical unsupported assumptions about all other disabled children and their unique needs arising from their constellation of impairments.

201. As a direct and proximate result of Defendant's discriminatory actions, Sarah has suffered and continues to suffer harm, including exclusion from educational activities, emotional distress, and deprivation of her right to be free from discrimination.

202. Defendant acted with deliberate indifference to Sarah's federally protected rights and engaged in further disability discrimination by adopting a narrow and generalized approach to accommodation that violates the individualized good faith requirements of the federal and state statutory accommodation laws.

## THIRD CAUSE OF ACTION

### Violation of Section 504 of the Rehabilitation Act
### Against Organizational Defendant

203. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

204. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination against qualified individuals with disabilities by programs receiving federal financial assistance.

205. Defendant Oceanside Union Free School District receives federal financial assistance and is therefore subject to the requirements of Section 504.

206. Sarah is a qualified individual with disabilities within the meaning of Section 504, as her conditions substantially limit major life activities and bodily functions.

207. Sarah is otherwise qualified to participate in the educational programs, services, and activities offered by the District.

208. Defendants discriminated against Sarah by denying her reasonable accommodations in the form of a medical exemption from the Hepatitis B vaccine requirement, despite substantial evidence that such vaccination would be dangerous to her health.

209. The requested accommodation would not fundamentally alter the nature of Defendants' educational program or impose an undue burden on Defendants.

210. Defendants discriminated against Sarah by failing to conduct an individualized assessment of her accommodation needs, instead applying a blanket policy that makes unsupported, generalized assumptions about disabilities. Specifically, by asserting that only children with a documented anaphylactic reaction to a prior Hepatitis B vaccine qualify for exemption, Defendants arbitrarily disregarded Sarah's unique medical conditions, as substantiated by six physicians' certifications and additional corroborating evidence and opinion. This categorical approach recklessly ignores the diverse needs of disabled children, violating their right to individualized consideration under disability law.

211. As a direct and proximate result of Defendants' discriminatory actions, Sarah has suffered and continues to suffer harm, including exclusion from educational activities, emotional distress, and deprivation of her right to be free from discrimination.

212. Defendants have acted with deliberate indifference to Sarah's federally protected rights.

## FOURTH CAUSE OF ACTION

### Violation of the Free Exercise Clause - First Amendment
### Against All Defendants

213. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

214. The Free Exercise Clause of the First Amendment, made applicable to state actors through the Fourteenth Amendment (*Cantwell v. Connecticut,* 310 U.S. 296 (1940)), prohibits government from substantially burdening religious exercise unless the burden is justified by a compelling governmental interest and narrowly tailored means. *Agudath Israel of America v. Cuomo*, 983 F.3d 620, 631-32 (2d Cir. 2020).

215. Jane Doe and Sarah Doe hold sincere religious beliefs as practicing Catholics that informs their approach to medical decision-making in accordance with guidance from God through prayer, scripture and church teachings. Jane Doe brings this claim both individually as a parent whose religious exercise rights were violated, and on behalf of Sarah whose developing religious conscience was coerced. The claim also involves hybrid rights, as Jane also has a standalone fundamental right to make religious and medical decisions for her child.

216. Defendants' enforcement of NYS Public Health Law § 2164 substantially burdens Plaintiffs' religious exercise by: (a) forcing them to choose between their religious convictions and Sarah's access to public education; (b) compelling Sarah to receive the third Hepatitis B vaccine dose, which violates their beliefs; and (c) denying religious accommodations while exercising discretionary authority over exemptions for other reasons, like medical accommodation under 10 NYCRR § 66-1.3.

217. The Public Health Law vaccine mandate, as enforced by Defendant, is not generally applicable because it permits individualized medical exemptions subject to discretionary decision-making by school officials, who are government actors (10 NYCRR § 66-1.3), while categorically prohibiting religious exemptions (*Fulton v. City of Philadelphia,* 593 U.S. 522 (2021)). Defendant's discretion is evidenced by: (a) denying Sarah's medical exemption despite certifications from seven providers; (b) granting a prior medical exemption from a neighboring school district doctor but then denying the follow up exemption from another doctor in the same practice that provided identical reasoning; and (c) exercising subjective judgment without medical justification.

218. The DOH confirms this discretion, advising principals they have full authority to grant or deny medical exemptions, even in cases where the DOH believes that the exemption request is not consistent with ACIP, thus undermining the Second Circuit's assumption of non-discretionary exemptions in recent case law (*Miller v. McDonald*, No. 24-159 (2d Cir. Mar. 3, 2025)). Unlike in *Miller,* this case does plead specific facts to show that the medical exemption is fully discretionary at least as applied by Defendants.

219. Because Defendants exercise discretionary authority over medical exemptions while categorically denying any religious accommodation, the vaccination requirement is not generally applicable and the burden on Sarah and her family's religious beliefs must satisfy strict scrutiny under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021).

220. Though lack of general applicability is sufficient to trigger strict scrutiny alone, the facts also show animus. Nurse Conlan's emails mention the fact that Sarah had a religious exemption until 2019, as if this fact calls into question the validity of a medical exemption.

This animus is another basis for triggering strict scrutiny. *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 534 (1993).

221. Defendants' policy fails strict scrutiny because, among other reasons: (a) the categorical denial of a religious exemptions is not narrowly tailored; (b) there are less restrictive means, such as allowing religious accommodation (like 46 other states allow, and New York allowed for decades until a few years ago); and (c) the discretionary medical exemption process shows absolute uniformity is not required to achieve public health goals. Defendants, as the state actors enforcing NYS Public Health Law § 2164, are liable for their policy's unconstitutional application, which denies Sarah's exemption through discretionary and biased decisions. Compliance with state law does not absolve Defendants from liability under 42 U.S.C. § 1983 for violating Plaintiffs' Free Exercise rights. *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943).

222. Defendants' policy cannot even satisfy a rational basis when it comes to the vaccine at issue here. Hepatitis B vaccination is non-sterilizing, meaning that vaccination does not serve a public health benefit, but rather is for personal protection. Moreover, even if Sarah Doe had actual Hepatitis B (rather than simply lacked the last dose of the vaccine series), Defendants could not exclude her, because it is well established that students with Hepatitis B do not pose a direct threat in a school setting. The school has no interest or qualifications to override Sarah's treating physicians or force the Does to violate their sincerely held religious beliefs to get vaccinated with Hepatitis B against medical advice and guidance from God.

223. As a direct result of Defendants' violations of the Free Exercise Clause, Plaintiffs have suffered and continue to suffer irreparable harm, including deprivation of constitutional

rights, exclusion from public education, and forced violation of sincerely held religious beliefs.

## FIFTH CAUSE OF ACTION

### Violation of Substantive Due Process - Fourteenth Amendment
### Against All Defendants

224. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

225. The Due Process Clause of the Fourteenth Amendment protects certain fundamental rights from government interference, including the right to refuse unwanted medical treatment and the right of parents to make medical decisions for their children in accordance with the advice of chosen physicians without interference or coercion from state actors.

226. Jane Doe has a fundamental right to make medical decisions for her minor child Sarah in accordance with the advice of their chosen physicians.

227. Jane and Sarah have a fundamental right to refuse unwanted and likely harmful medical interventions that multiple treating physicians have certified place the child at risk of serious harm or death.

228. Defendants' actions in denying Sarah's medical exemption from the Hepatitis B vaccine requirement and excluding her from school despite certifications from seven medical providers, including a walk-in clinic doctor, who certified that Sarah is INELIGIBLE to take the vaccine substantially interfere with these fundamental rights.

229. Pursuant to the unconstitutional conditions doctrine, the government cannot directly infringe these rights or impose conditions on benefits, like the right to receive a public education, on the waiver of these rights.

230. Defendants Dr. Antwan Haskoor and Mary Conlan, acting under color of state law, but exceeding their authority, violated Sarah's clearly established constitutional and statutory rights as set forth in preceding claims.

231. Nurse Conlan engaged in direct harassment and discriminatory conduct as set forth more fully in the complaint, by, for example, denying scooter accommodation, discussing Sarah's private vaccine status publicly so other students could here, retaliating against Sarah by denying her access to the nurses' office when her nerve pain required her to ice her foot. She also provided discriminatory commentary and unsupported suspicions in her requests to the District to deny Sarah's multiple medical exemption requests from the Hepatitis B vaccine.

232. Dr. Haskoor exceeded his medical consultation role by creating and implementing administrative policy that directly contradicts PHL § 2164(8). Because of Dr. Haskoor, the District maintains an unofficial policy, practice, or custom of categorically denying medical exemptions except for documented anaphylaxis, as evidenced by Dr. Haskoor's April 8, 2025 email stating this official policy and the consistent pattern of denials despite certifications from multiple licensed physicians. This policy was implemented with deliberate indifference to Plaintiffs' constitutional rights and was the moving force behind the constitutional violations alleged herein.

233. All Defendants' interference with Plaintiffs' fundamental rights is not narrowly tailored to serve a compelling governmental interest, especially given that: a. Multiple licensed

physicians have certified that the Hepatitis B vaccine is contraindicated for Sarah and dangerous to her health; b. Sarah has already suffered severe adverse reactions to previous doses of the Hepatitis B vaccine; c. The Hepatitis B vaccine is not capable of providing sterilizing immunity and does not prevent transmission of Hepatitis B, thus negating the public health reasoning invoked under police powers for many other vaccines; d. The CDC has acknowledged that there has never been a documented case of Hepatitis B transmission in any school setting; and e. Even children with active Hepatitis B infections are allowed to attend school under New York State law.

234. Defendants' actions do not even meet a rational basis, but are instead arbitrary, conscience-shocking, and an abuse of government power.

235. Defendants' determination was made without considering the substantial medical evidence provided by multiple licensed physicians that the Hepatitis B vaccine would be detrimental to Sarah's health.

236. Defendants' determination was made without providing a rational basis for rejecting the medical opinions of multiple licensed physicians, including specialists in relevant fields.

237. Defendants' determination was made without conducting any independent medical evaluation of Sarah.

238. Defendants' determination disregarded the fact that Hepatitis B is not communicably transmitted in school settings and that the vaccine is for personal protection rather than preventing transmission.

239. Even under the deferential standard of *Jacobson v. Massachusetts* (which should not apply here given that Hepatitis B vaccine requirements are not justified under police powers

since this vaccine cannot stop transmission), Defendants' conduct fails constitutional scrutiny. *Jacobson* recognized that vaccination requirements must include medical exemptions to protect all individuals likely to be harmed, and courts must intervene when such protections are denied to any such individual. 197 U.S. at 38-39. Here, seven licensed physicians have certified Sarah's risk of harm, satisfying *Jacobson's* own standard for judicial scrutiny.

240. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer harm, including deprivation of fundamental constitutional rights and deprivation of her right to an education, secured by New York State law.

## SIXTH CAUSE OF ACTION

### Violation of Article I, Section 3 of the New York State Constitution (Religious Freedom) Against All Defendants

241. Plaintiffs repeat and reallege the allegations set forth in this entire complaint as if fully set forth herein.

242. Article I, Section 3 of the New York State Constitution provides that "the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind," and that such liberty of conscience "shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state."

243. The New York Constitution's religious freedom protection is broader than the First Amendment and does not require that government action be neutral or generally applicable to trigger heightened scrutiny. *Catholic Charities of Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525-26 (2006).

244. Jane and Sarah Doe hold sincere religious beliefs as practicing Catholics that inform their approach to medical decision-making through prayer, scripture, and Catholic teachings about parental authority and bodily integrity.

245. Defendants' enforcement of the Hepatitis B vaccine requirement substantially burdens Plaintiffs' religious exercise by forcing them to choose between their sincere religious convictions and Sarah's access to public education, and by compelling medical treatment that violates their religious conscience.

246. Under the New York Constitution, government action that substantially burdens religious exercise is subject to strict scrutiny and must be justified by a compelling state interest achieved through the least restrictive means, regardless of whether the law is neutral or generally applicable.

247. Defendants cannot satisfy strict scrutiny because the Hepatitis B vaccine requirement, as applied to Sarah, does not serve the compelling state interests traditionally recognized under the police power, specifically public health and safety, because:

   a.     The Hepatitis B vaccine is non-sterilizing and does not prevent transmission, serving only individual protection rather than community health;

   b.     The CDC acknowledges no documented cases of Hepatitis B transmission in school settings, negating any public safety rationale;

   c.     Even students with active Hepatitis B infections are permitted to attend school under established law, demonstrating no direct threat to public safety;

   d.     The vaccine requirement as applied to Sarah contradicts public health by forcing vaccination against the medical advice of seven licensed physicians who have certified

serious risk of harm, further undermining any safety rationale, whether for the public or Sarah's personal benefit.

248. The constitutional language limiting religious freedom for acts "inconsistent with the peace or safety of this state" does not apply here because Sarah's unvaccinated status poses no threat to public peace or safety, given that Hepatitis B is not transmissible in school settings and the vaccine does not prevent transmission.

249. Even if a compelling state interest existed, Defendants' categorical refusal to accommodate religious beliefs is not the least restrictive means, as demonstrated by: (a) their own acceptance of medical exemptions in other cases; (b) the availability of alternative accommodations; and (c) the individual protection nature of the Hepatitis B vaccine.

250. Defendants' enforcement violates the "without discrimination or preference" clause by systematically privileging secular scientific beliefs over religious beliefs when both address the same fundamental question: what is best for Sarah's health and safety. Jane Doe's religious conviction, formed through prayer and divine guidance, led her to believe vaccination would harm Sarah - a belief that proved prophetically accurate when Sarah suffered severe injuries from the 2019 vaccinations. Now, multiple licensed physicians confirm through scientific analysis what Jane discerned through religious guidance: that further vaccination poses serious risks to Sarah. Yet Defendants treat Jane's religiously-informed judgment as categorically inferior to physicians' scientifically-informed judgment, despite both reaching identical conclusions about Sarah's welfare. This preferential treatment of secular over religious epistemology - treating scientific methodology as inherently superior to religious discernment - violates the Constitution's

mandate that religious exercise be protected "without discrimination or preference," particularly where the religious guidance has proven accurate and aligns with subsequent medical findings.

251. The distinction between "religious" and "medical" beliefs is increasingly artificial in contemporary society, where scientific materialism functions as a competing belief system with its own articles of faith, methodological assumptions, and claims to ultimate truth. Both religious and scientific frameworks make truth claims about reality that cannot be definitively proven; the difference lies in methodology, not certainty. When Jane's religious discernment proves accurate about Sarah's medical needs - as confirmed by subsequent medical evidence - Defendants cannot constitutionally privilege secular over religious ways of knowing simply because one uses peer review and the other uses prayer. Fit parents are given the express right and obligation to make medical and religious decisions for their children, which can take into consideration guidance from prayer, trusted doctors' recommendations, and other sources of wisdom and discernment about what is in the best interests of their children.

252. The religious claims are strengthened by the parents' constitutional right to make medical decisions for their children. In *Matter of Hofbauer,* 47 N.Y.2d 648 (1979), the Court of Appeals held that children have a protected constitutional right to choose and follow the advice of their chosen state-licensed physician, and pursuant to the United States Supreme Court's decision in *Doe v. Bolton,* the state cannot substitute its judgment based on a difference of medical opinion about what is best for the child. *Id.* at 655-56; *see also Troxel v. Granville*, 530 U.S. 57, 58 (2000) Particularly in a case such as this, where the "vaccine" at issue provides only protection from symptoms, not infection and

transmission, and cannot be argued to be necessary to protect the public at large, the state lacks the authority to override Jane and her treating physician's determinations. *Parham v. J.R.*, 442 U.S. 584, 604 (1979).

253. The state, and its' enforcers at the school district level, have no compelling or even legitimate interest in interfering with these constitutionally guaranteed parental rights, especially for the Hepatitis B vaccine, which is solely administered for personal protection against symptoms, and cannot stop a person from getting infected and passing on Hepatitis B. Rather, the state is prohibited from interfering in a fit parent's determination about whether the risks of this vaccine outweigh the benefits.

254. As a direct and proximate result of Defendants' violations of Article I, Section 3, Plaintiffs have suffered irreparable harm including deprivation of constitutional rights, exclusion from public education, forced violation of religious conscience, and emotional distress.

### SEVENTH CAUSE OF ACTION

**Violation of Separation of Powers –
Unlawful Regulatory Override of Legislative Mandate
Against All Defendants and Organizational Defendants**

255. Plaintiffs repeat and reallege all allegations as if fully set forth herein.

256. This claim arises under the separation of powers doctrine embodied in Articles III, IV, and V of the New York State Constitution, which establish distinct legislative, executive, and judicial powers and prohibit one branch from usurping the constitutional functions of another.

257. New York Public Health Law § 2164(8) provides in clear, unambiguous language: "If any physician licensed to practice medicine in this state certifies that such immunization may

be detrimental to a child's health, the requirements of this section shall be inapplicable until such immunization is found no longer to be detrimental to the child's health."

258. The Legislature's use of "any physician" establishes a singular standard requiring only one licensed physician's certification based on that physician's medical judgment about potential detriment to the individual child's health.

259. The Legislature deliberately used broad language - "may be detrimental to a child's health" - to ensure deference to physician medical judgment about potential harm to individual children, recognizing that medical risks cannot be reduced to rigid bureaucratic checklists.

260. Defendants have violated the separation of powers by effectively rewriting this legislative standard through unauthorized policy implementation that: (a) changes the singular "any physician" standard to require agreement among multiple physicians and school bureaucrats; (b) ignores the mandatory "shall be inapplicable" language by continuing to exclude children despite proper physician certification; and (c) substitutes narrow administrative judgment about "sufficient" articulation of complex standards of care for physician determination of potential detriment.

261. Under *Boreali v. Axelrod*, 71 N.Y.2d 1 (1987), Defendants' conduct violates separation of powers principles as demonstrated by the four coalescing factors:

a. **Policy Judgments Beyond Guidelines:** Rather than applying preexisting legislative guidelines, Defendants made value judgments entailing difficult and complex choices by determining that only narrow categories of medical risks (specifically anaphylaxis immediately after the last vaccine, which a treating doctor is able to discuss on the phone) warrant protection, despite the Legislature's broad "may be detrimental" standard and the absence of any such limitation in the statute; allowing bureaucrats to second guess whether

the physician sufficiently articulated such narrow criteria also violates the singular physician standard and the mandatory nature of § 2164(8).

**b**. **Writing on a Clean Slate**: Rather than filling in details of the Legislature's broad policy of a single physician standard, and an individualized determination about what may be detrimental to a particular child's health, Defendants created their own comprehensive set of rules requiring specific administrative approval and narrow guideline compliance, without benefit of legislative guidance authorizing such restrictions or even scientific support, as ACIP itself acknowledges the best practices guidelines are not exhaustive and cannot provide individualized medical advice;

**c. Legislative Attempts**: The Legislature has not attempted to narrow the "any physician" standard or require administrative approval of physician certifications, indicating satisfaction with the broad deference standard it enacted; moreover, attempts to legislatively remove or narrow the medical exemption repeatedly failed.

**d. Lack of Medical Expertise**: School administrators and bureaucrats lack the specialized medical expertise to override the clinical judgments of licensed physicians who have actually examined individual patients, yet Defendants systematically substitute their administrative judgment for medical expertise. It is unlawful for a school district bureaucrat to make medical recommendations for an individual child, even if they consult with non-treating physicians. Even the CDC admits it cannot give medical advice. Nor are school bureaucrats qualified to overrule a physician's determination that the advice given comports with evidence-based standards of care, a complex topic that typically requires experts on each side and is hotly contested. It is wildly unsafe to allow school

administrators (even guided by consultants) to try to determine based on a short note on a form, whether the determination complies with standards of care.

262. Defendants' reliance on a narrow interpretation of ACIP guidelines to override physician medical judgment further violates separation of powers because: (a) ACIP explicitly acknowledges its guidelines are not exhaustive and cannot define all reasons a child may be at risk of harm; (b) ACIP committee members have admitted their guidelines cannot capture all individual medical circumstances; (c) the Legislature chose broad language ("may be detrimental") specifically to avoid limiting medical judgment to any particular set of guidelines; and (d) using non-exhaustive administrative guidelines to override physician determinations exceeds executive authority.

263. This regulatory overreach is demonstrated by Sarah's case where six licensed physicians who actually evaluated her determined serious risk of harm, consistent with ACIP and other nationally recognized evidence based standards of care defining precautions and contraindications in broad terms, yet administrative review focused solely on whether their certifications sufficiently articulated connection to narrow bureaucratic interpretations of one non-exhaustive example provided in ACIP as a contraindication, rather than actual medical reality of potential detriment to her health.

264. Sarah's exemption requests from multiple licensed physicians satisfy the clear statutory requirement ("any physician" certifying potential detriment), yet Defendants unlawfully substitute their administrative judgment for both legislative mandates and medical expertise.

265. This separation of powers violation requires judicial intervention to restore the legislative standard, prevent continued executive overreach in medical decision-making, and protect children from harm caused by bureaucratic override of physician medical judgment.

266. Plaintiffs seek declaratory relief that Defendants' enforcement practice violates the separation of powers and exceeds their lawful authority under PHL § 2164(8), and injunctive relief prohibiting continued enforcement of the unlawful standard.

267. Defendants lack authority to enforce PHL § 2164(8) in a manner that contradicts the Legislature's clear mandate, and this Court has jurisdiction to declare such enforcement unlawful and enjoin its continuation.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C. § 1983 – Municipal Liability (*Monell*)
### Against Organizational Defendant

268. Plaintiffs repeat and reallege all allegations as if fully set forth herein.

269. A school district is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) when a constitutional or federal-statutory injury is caused by:

   a. an official policy,

   b. a widespread custom or practice, or

   c. a decision of a final policymaker.

270. District Policy and 10 NYCRR § 66-1.3(c) delegate final authority over immunization exclusions to the School Principal and, upon information and belief, Principal Mitchell improperly delegates his decision-making authority to Dr. Haskoor. Their determinations are therefore District policy.

271. On April 8, 2025, School Physician Dr. Haskoor announced that he would deny all medical-exemption requests unless he could confirm an immediate anaphylactic reaction with the physician who treated the reaction.

272. Principal Mitchell and all other Defendants and agents of the District adopted and enforced that rule, and no waiver has been granted since.

273. The rule eliminates individualized assessment of other contraindications or ACIP "precautions," thereby denying disabled students a reasonable accommodation and excluding them from a public program in violation of Title II of the ADA (42 U.S.C. § 12131, et seq.) and NYSHRL.

274. Because these decision-makers possessed final authority over admissions, their rule constitutes an official District policy that was the moving force behind the ADA injury to Sarah Doe.

275. Additionally, although New York repealed its religious-exemption statute in 2019, it left, in practice, § 2164(8) medical exemptions entirely discretionary.

276. Through Dr. Haskoor's "anaphylaxis-only" rule and the Principal's blanket denials, Oceanside permits individualized exemptions for some medical reasons while refusing any comparable consideration for religious reasons.

277. Under *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), a policy that allows discretionary exemptions is not generally applicable and therefore triggers strict scrutiny when it burdens sincere religious exercise.

278. The District's policy therefore substantially burdens Plaintiffs' Free-Exercise rights without a compelling, narrowly tailored justification, and the deprivation flows directly from the official policy adopted by final policymakers.

279. Beginning 4 February 2025, Oceanside conditioned Sarah's education on her receiving a third Hep-B dose that six treating physicians say is medically dangerous.

280. This ultimatum forces Sarah to choose between her bodily integrity and her right to public education, and overrides Jane Doe's parental medical-decision authority—interests the Supreme Court recognizes as fundamental.

281. By enforcing this ultimatum through its final policymakers (the Physician and Principal) and by maintaining an official exclusion policy for unvaccinated students regardless of individualized risk, the District enacted a custom that shocks the conscience and directly caused Plaintiffs' substantive-due-process injuries.

282. The policies and customs identified above were the moving forces behind Sarah's loss of schooling, emotional distress, and ongoing medical risk.

283. Plaintiffs seek declaratory and injunctive relief, compensatory and punitive damages, and attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that Defendants' actions violate the Free Exercise Clause of the First Amendment, the Due Process Clause of the Fourteenth Amendment, the New York State Human Rights Law, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, New York Education Law, and the New York State Constitution;

B. Issue a permanent injunction directing Defendants to provide Sarah with a medical exemption from the Hepatitis B vaccine requirement for the remainder of her time at Oceanside;

C. Issue a declaratory judgment that New York's categorical denial of religious exemptions from vaccination requirements violates the Free Exercise Clause when implemented alongside a discretionary medical exemption process;

D. Award nominal, compensatory, punitive and any other allowable damages in an amount to be determined at trial;

E. Award Plaintiffs their reasonable attorneys' fees, costs, and disbursements pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, 42 U.S.C. § 1988, and other applicable law;

F. Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand trial by jury for all issues so triable.

**Dated:** June 12, 2025
Ithaca, NY

Respectfully submitted,

**GIBSON LAW FIRM, PLLC**

By: */s/ Sujata S. Gibson*
Sujata S. Gibson
120 E Buffalo Street, Suite 2
Ithaca, NY 14850
(607) 327-4125
sujata@gibsonfirm.law
Attorneys for the Plaintiffs

## **VERIFICATION**

I, JANE DOE, verify under penalty of perjury according to the laws of the State of New York that the foregoing Amended Complaint is true and accurate to the best of my knowledge, except as to matters stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

Dated: June 12, 2025

/s/ Jane Doe

JANE DOE